# CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY
### v.
## WILLIAM 'SIERER.

1. RAILROAD FENCE—GATE AT CROSSING—DUTY OF COMPANY.—A railroad company is not required to patrol the line of its road to see if the gates at farm crossings are left open. Nor to keep a guard upon the road sufficient to discover and counteract such carelessness immediately upon its occasion. The company is only negligent when it has had reasonable time to discover such breach or has been notified and failed to take proper action.

2. VERDICT UNSUPPORTED BY EVIDENCE.—The verdict in this case is set aside as wholly unsupported by the evidence of negligence charged in the declaration. For the jury were here bound to find from the evidence that the proper agents of the company charged with the duty of looking after this gate as part of the fence, did look after it on the morning of the day in question and found it to be just as it should be, which would rebut the presumption, if any had been raised, that it was continuously open from the 23d.

APPEAL from the Circuit Court of Warren county; the Hon. JOHN J. GLENN, Judge, presiding. Opinion filed July 27, 1883.

Mr. WM. C. NORCROSS and Mr. O. F. PRICE, for appellant; that, until the contrary is proved, it is presumed that every man obeys the mandates of the law, cited 1 Greenleaf on Ev. Ch. 4, § 40.

As to the duty of the owner of a farm to keep the gate closed at a railroad crossing: I. C. R. R. Co. v. McKee, 43 Ill. 122; I. C. R. R. Co. v. Dickerson, 27 Ill. 55; I. & St. L. R. R. Co. v. Hall, 88 Ill. 368; C. B. & Q. R. R. Co. v. Magee, 60 Ill. 529; Session Laws, 1879, 224; R. S. Ch. 114, § 48.

Where the verdict is contrary to law and evidence, the case should be reversed: Adams Express Co. v. Jones, 53 Ill. 463; Dawson v. Robbins, 5 Gilm. 72.

Positive evidence is better than negative: C. & R. I. R. R. Co. v. Still, 19 Ill. 500.

Mr. JAMES W. DAVIDSON and Mr. J. L. DRYDEN, for appel-

lee; as to the duty of railroad companies to erect gates and bars at farm crossings and keep them closed, cited P. P. & J. R. R. Co. v. Barton, 80 Ill. 72; C. & N. W. R'y Co. v. Harris, 54 Ill. 528; I. C. R. R. Co. v. Arnold, 47 Ill. 173; T. W. & W. R. R. Co. v. Nelson, 77 Ill. 160.

As to preponderance of evidence: Crabtree v. Reed, 50 Ill. 206; Peak v. The People, 76 Ill. 286; McCarthy v. Mooney, 41 Ill. 300; Broughton v. Smart, 59 Ill. 440; Paton v. Stewart, 78 Ill. 481; Hubbard v. Rankin, 71 Ill. 124; Chicago City R'y Co. v. Young, 62 Ill. 238; Rogers v. The People, 98 Ill. 581; Birdenthal v. Davidson, 61 Ill. 460; Gowen v. Kehoe, 71 Ill. 66; Meyer v. Mead, 83 Ill. 19; Carter v. Gunnels, 67 Ill. 270; Pulliam v. Ogle, 27 Ill. 189.

PLEASANTS, J.  Some time in the night of Oct. 24, 1883, a train of cars on appellant's railroad at a point about five miles east of Monmouth killed five horses of appellee, for which he recovered judgment on a verdict for $550 damages.  They got upon the right of way through a gate at a farm crossing on Mrs. Eilenberger's land lying north of the track and adjoining appellee's on the west, having passed the partition fence to reach it.  It was a sliding gate, well made of suitable pine boards and in good order, and, being the only direct means of communication with the public highway on the south side of the railroad, was much used.  The gravamen of the action as stated in each count of the declaration is that the defendant "knowingly, carelessly, and negligently opened and suffered to remain standing open a certain gate at a certain farm crossing," etc., by means whereof the horses strayed upon the track and were killed.  It is evident that this gate had been left open by some person, but it is not claimed that the defendant did it or had actual notice of it at any time it remained open next before the horses went through it on the occasion in question.  To make out a case, then, under the declaration, it must appear to have "remained standing open" so long that the law will impute negligence to the company for not learning its condition in time to prevent the escape. Proof that it had previously been open during unreasonably

long periods and with short intervals would not avail; since no injury resulted to plaintiff from defendant's negligence on these occasions, and being wholly distinct from that declared on they would have no tendency to prove it. For the same reason the condition of the railroad fence at other points, when the horses escaped, would be also immaterial.

How long then had the gate been open? Upon this point the testimony for the plaintiff was quite brief. Irene Lickman saw it open a little after one o'clock, and again about four, in the afternoon of the 24th; also on the 21st or 22d; and before that at times not particularly stated, nor generally as to number, had seen different persons pass through neglecting to shut it. Samuel Fox saw it open on the afternoon of the 24th, probably about six o'clock, as he first stated, though on cross-examination he was far from positive, putting it only between four and six; and also on the day before, at or about what time does not appear. And this is all.

These horses got out some time during that night. One witness ventures the opinion that it was between ten and twelve o'clock, but gives no reason for it; and no more is known on this subject than that on the next morning they were found dead and lying on both sides of the track about half a mile east of the gate.

Proof of a certain state or condition of things at a given time will raise a presumption of fact strong enough to support a finding that it continued for a longer or shorter time thereafter, or until shown to be changed, according to the nature and surroundings of the subject. If this gate was seen open at six o'clock in the afternoon of the 24th it may be presumed in the absence of proof to the contrary to have continued open until the horses went through; if open at four o'clock, that it so remained until six; and in like manner from one until four of the same day. But under the circumstances here shown we do not think that proof of its being open at some time not stated, on the 23d, ought to raise any presumption that it so continued until one o'clock in the afternoon of the 24th. The frequent use of it, the penalty provided for leaving it open and the interest of the occupant of the farm, would greatly weaken

the presumption in the cases before mentioned, and with the addition of the known business methods of railroad companies entirely destroy or forbid it in this. While there is therefore, some evidence on the part of the plaintiff tending, with the aid of these presumptions, to prove that the gate had been open continuously from one o'clock in the afternoon of the 24th there is none that it was so any longer. And the question is whether any duty resting on the company required attention to its condition after that hour during that day or night, without actual notice that it was open.

The answer must depend upon what attention, and how recently before that hour, the company had given it. For it was not required to patrol the line of its road to see if the gates at farm crossings were left open. I. C. R. R. Co. v. McKee, 43 Ill. 122; Same v. Dickenson, 27 Id. 56. Nor to keep a guard upon it sufficient to discover and counteract such carelessness immediately upon its occasion. C. & N. W. R'y Co. v. Harris, 54 Id. 528. It was not negligent unless it had had reasonable time to discover it or been notified and failed to take proper action. I. & St. L. R. R. Co. v. Hall, 88 Id. 368; I. C. R. R. Co. v. Swearingen, 47 Id. 206. It was required by the statute to erect and maintain on the lines of its right of way sufficient fence with suitable bars or gates at farm crossings and cattle-guards at all. When these had been provided, if a casual breach occurred or defect appeared therein the extent of its duty to owners of stock upon adjoining lands was to exercise ordinary care and use ordinary diligence to repair and remedy them. These gates, when closed, were parts of the fence, and the company's duty in respect to keeping them closed was included in that of maintaining the fence. But it extended no further than to use reasonable or ordinary diligence to see that they were closed when they ought not to be open. They were erected and maintained for the accommodation of the farmer in all his relations with the world outside, and intended to be opened by him and others not under control of the railroad company whenever required by occasions properly growing out of those relations. Hence the law imposed, upon them also the duty, enforceable by penalties, to

see when they opened these gates that they were not needlessly left open. The railroad company having no occasion of its own to open them and being unable to anticipate those of others, might reasonably rely to a large extent upon their performance of this duty and regulate the frequency of its attention in view rather of its exclusive duty to maintain the gate in proper condition to be opened and shut and a proper fence when shut, than of the common one to keep it properly shut. This was all that was reasonable or practicable and quite in harmony with the idea advanced in C. & N. W. R'y Co. v. Harris, *supra*, that the latter is included in the former. If not derelict in respect to the duty to maintain the fence, it could not be so in respect to that of keeping these parts of it properly shut.

What then had the company done in this behalf? The boss of the section and three of his men concur in the statements that according to their daily habit they went over the lines in the forenoon of the 24th to see if any repairs were needed on the road-bed, fences or other structures, with material, tools and hands to make them; that between eight and nine o'clock, they were working very near this gate; and that they then positively noticed it shut and apparently in good order. Their memory may be trusted, both as to the fact and the date, from the circumstance that on the following morning when about to begin work at the same place, they were called to bury the bodies of these horses. Their tracks were then followed by others from where they were struck, back to the gate, and doubtless the conjectures and statements of those present as to its condition when they came through and before, served to recall and fix the then recent facts to which they testified. There was not a single witness or circumstance in the case to cast the shadow of a doubt upon their testimony, nor was it at all improbable in itself. That the gate was soon afterward on the same day seen open, and also open on other days on which they say they saw it shut, amounted to nothing in the nature of contradiction. It is vain in such a case to instruct a jury that they are the judges of the credibility of the witnesses, and in determining it, should consider their conduct and appear-

ance on the stand and the like, because it presents no question of credibility to be determined. If the jury are ever to find a fact upon the evidence, they were here bound to find that the proper agents of the company charged with the duty of looking after this gate as part of the fence did look after it on the morning of that day, and found it to be just as it should be. This would rebut the presumption, if any had been raised, that it was continuously open from the 23d. It is conceded that they were there again on the following morning and it was then also shut and in good order.

· In the case of the I. C. R. R. Co. v. Swearingen, *supra*, in which some of the plaintiff's stock was killed on the road during Saturday night, and some during Sunday night, the Supreme Court said: " When the proper agent of the company, whose duty it was to look to and keep the fence in repair, is shown to have seen it in good repair on Saturday afternoon at four o'clock, and again on Monday morning, we are at a loss to understand how there was any neglect of duty on the part of appellant." If that was due care and diligence in respect to fences with the care of which the company was wholly and exclusively charged, it will not be less in respect to gates with the shutting of which it was only charged in common with others. The reason and reasonableness of this is illustrated in the case before us. For it here appears that Mr. Wallace, the tenant of Mr. Eilenberger's farm, on his return from work outside at the close of the day, not far from six o'clock, on the 24th, came through this gate and left it closed. That was the last he knew of its condition until the next morning; and for all the purposes of the defense his act is as if it had been the act of the company. Surely it would be unjust and unreasonable to hold it responsible for the consequences of the subsequent opening without its knowledge or consent. To do so would be in effect to require it to maintain a constant guard, day and night, at every such gate. While, therefore, it may be conceded that at one stage of the case there was what amounted to evidence tending to prove the negligence charged, at its close there was none. The testimony on the part of the defendant did not controvert

a single fact which that of the plaintiff tended to prove, and so leave room for the exercise of a jury's proper function, to determine on which side was the preponderance. It merely established additional facts that rebutted presumptions arising from the former alone, and without whose aid they constituted no evidence whatever. It is not easy to account for the verdict, unless we suppose the jury understood the law as requiring the railroad company, absolutely and at its peril, to keep the gate closed except during the few moments, from time to time, when necessary to have it opened for the accommodation of the adjoining land owner or his tenant. And we think it not improbable that such understanding was derived from the first and second instructions given for the plaintiff. The first paragraph of the first instruction informs the jury that " by the law of this State, every railroad corporation is required to erect, and thereafter maintain, fences," etc., "with gates * at the farm crossings * * and also thereafter to repair and maintain said gates, * * and keep the same shut and suitable," etc. This was too broad and absolute as to the duty here in question. So in the second, the language on this point is: "And thereafter, to keep the same closed and in sufficient repair, as explained in these instructions." And though in applying the rule of duty the jury are repeatedly told that to warrant a verdict for plaintiff, they must find that the horses got on the track " by reason of their negligently failing to keep the said gate closed," they might have understood this in the light of the statements above quoted to authorize a finding that a failure to keep it closed was negligence, rather than to require a finding that such failure was in consequence of negligence. Whether this defect was or was not cured by other instructions it is unnecessary to decide, since we reverse the judgment for error in overruling the motion to set aside the verdict as wholly unsupported by evidence of the negligence charged in the declaration.

Reversed and remanded.